| | |
|---|---|
| **JAY DARDENNE, AS LIEUTENANT GOVERNOR OF THE STATE OF LOUISIANA AND AS COMMISSIONER OF THE LOUISIANA DEPARTMENT OF CULTURE, RECREATION AND TOURISM** | **CIVIL ACTION NO: _____** |
| **VERSUS** | **SECTION: _____** |
| **MOVEON.ORG CIVIL ACTION** | **MAGISTRATE JUDGE:_____** |

_____

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S**
**MOTION FOR PRELIMINARY INJUNCTION**
_____

MAY IT PLEASE THE COURT:

This *Memorandum in Support of Plaintiff's Motion for Preliminary Injunction* is submitted in support of the *Plaintiff's Motion for Preliminary Injunction* filed on behalf of Jay Dardenne, in his official capacity as Lieutenant Governor of the State of Louisiana (the "Lieutenant Governor") and as Commissioner of the Louisiana Department of Culture, Recreation and Tourism (sometimes hereinafter, the "Department")..

### *Facts*

The Office of the Lieutenant Governor is a constitutionally created office of the Executive Branch of the State of Louisiana pursuant to LSA-Const. Art. 4, §1. The Department of Culture, Recreation and Tourism (sometimes referred to herein as the "Department") is a "body corporate" within the Office of the Lieutenant Governor pursuant to La. R.S. 36:201, and it is within the Lieutenant Governor's statutory power to appoint a secretary of the Department of Culture,

1

Recreation and Tourism, which the Lieutenant Governor has purposefully not done throughout his term in office. [*Affidavit of Jay Dardenne, attached hereto as Exhibit "A" ("Dardenne Affidavit")*].

In the absence of an appointment of a secretary by the Lieutenant Governor, the Lieutenant Governor is statutorily mandated to perform all duties, functions, and responsibilities of the secretary of the Department. As such, throughout his term in office as Lieutenant Governor, Jay Dardenne has served as Commissioner of the Department. [*See Dardenne Affidavit*].

The position of the Lieutenant Governor and his position as acting secretary and Commissioner of the Department of Culture, Recreation and Tourism are separate and distinct from the Office of the Governor. The Office of Lieutenant Governor and the Louisiana Department of Culture, Recreation and Tourism exist to preserve, showcase, and market Louisiana's rich cultural heritage to those within and outside of the State of Louisiana. [*See Dardenne Affidavit*].

Shortly after taking office in November of 2010, Jay Dardenne, personally, conceived the phrase "Louisiana Pick Your Passion" as a phrase that could be incorporated into a service mark to be used to promote culture, recreation and tourism in Louisiana. [*See Dardenne Affidavit*].

He chose "Louisiana Pick Your Passion" because it encourages the reader of the term to imagine the activities that make them happy and then suggests to them that Louisiana is where they can partake in any and all of such activities. *Id.*

The design of the "Louisiana Pick Your Passion" service mark, which included using all purple capital letters for "LOUISIANA" with the substitution of exclamation points for the letter "I" (i.e. "LOU!S!ANA") and the words "Pick Your Passion" in red cursive lettering was facilitated by the efforts of the Office of the Lieutenant Governor, the Department and its advertising agency of record, namely Peter A. Mayer Advertising, Inc. *Id.*

2

After the "Louisiana Pick Your Passion" logo and service mark was designed, the Lieutenant Governor instructed the Department of Culture, Recreation and Tourism to create a promotional and marketing campaign based on the design and to immediately begin implementing said promotional and marketing campaign. *Id.*

Pursuant to the Lieutenant Governor's guidance and instruction, the Department of Culture, Recreation and Tourism and all other agencies under the purview of the Office of Lieutenant Governor began using the "Louisiana Pick Your Passion" logo and term by placing the same on virtually every outward manifestation of the Office of the Lieutenant Governor and the Department. For example, the logo and service mark has been placed on all email signature blocks, letterhead, visitor stickers, websites, invoices, etc. used by the Department. *Id.*

Additionally, pursuant to the promotional and marketing scheme created by the Department of Culture, Recreation and Tourism, the "Louisiana Pick Your Passion" logo and service mark has been used extensively in television advertisements, promotional materials, magazine advertisements, and as a required and prominent part of Department sponsored events. After the Department commenced its use of the "Louisiana Pick Your Passion" logo and service mark, the Lieutenant Governor instructed his office to register the "Louisiana Pick Your Passion" logo and service mark under appropriate state and federal trademark laws. *Id.*

Since the inception of the "Louisiana Pick Your Passion" logo and service mark, The Office of the Lieutenant Governor and the Department of Culture, Recreation and Tourism expended approximately $69,427,429.00 on the promotion of the "Louisiana Pick Your Passion" mark and advertising campaign. The expenditures have been funded through both legislative appropriations, as well as the $30 million Louisiana Tourism Recovery Program funded by BP Exploration and

Production, Inc. The campaign includes but is not limited to running television advertisements, magazine advertisements, online advertisements, and event sponsorships in all fifty states and on an international level. Due to the efforts and effectiveness of the campaign, the Department won the Southeast Tourism Society's State Tourism Office of the Year Award for 2013, recognizing the Department for its execution and incorporation of Pick Your Passion. See: http://www.crt.state.la.us/tourism/ltpnewsletter/20131118/ltp20131118.htm. [*Dardenne Affidavit*].

The Office of the Lieutenant Governor created the service mark "LOUISIANA PICK YOUR PASSION LOGO: 'LOUISIANA IS IN PURPLE UPPERCASE LETTERS, WITH EXCLAMATION POINTS REPLACING EACH LETTER 'I'. 'PICK YOUR PASSION' IS IN RED, IN A MODIFIED CURSIVE FONT, ANGLED UPWARDS FROM LEFT TO RIGHT, BENEATH THE WORD 'LOUISIANA,'" (hereinafter referred to as the "Louisiana Service Mark") and registered same with the Louisiana Secretary of State's office on January 27, 2011, all as more fully shown as Exhibit "A" to the *Dardenne Affidavit*.

The Department registered the service mark "Pick Your Passion," with the United States Patent and Trademark Office (hereinafter referred to as the "Federal Service Mark") (the Federal Service Mark and Louisiana Service Mark are sometimes herein referred to, collectively, as the "Service Marks"), all as more fully shown as Exhibit "B" to the *Dardenne Affidavit*.

After the Department began using the Service Mark, the Office of the Lieutenant Governor and the Department also began licensing the Service Mark to approved third parties for use during approved and sponsored events. Attached to the *Dardenne Affidavit* as Exhibit "C", *in globo,* made a part hereof, and incorporated herein by reference, is a sample contract and authorization that requires the promotion and use of the Service Mark.

4

On or about March 5, 2014, it was brought to the Lieutenant Governor's attention that an organization called MoveOn.org had put up a billboard (the "Billboard") which included an advertisement, part of which significantly imitated the Louisiana Service Mark. The billboard is located on the east-bound side of Interstate Highway 10 in West Baton Rouge Parish, approaching the Mississippi River Bridge. The Lieutenant Governor personally traveled to this location and viewed the Billboard.  Attached hereto and incorporated herein by reference is a photograph of the Billboard by MoveOn.org, which is marked for identification as Exhibit "D" to the *Dardenne Affidavit*.

Upon viewing the Billboard, the Lieutenant Governor was concerned about the confusion which would be caused by the substantial imitation of the Service Mark, in that (a) the Office of the Lieutenant Governor and the Department of Culture, Recreation and Tourism would be considered the sponsor or author of the Billboard, and (b) those viewing the Billboard would believe it to be a promotion by the Lieutenant Governor's office. Specifically, MoveOn.org's Billboard imitates the artwork and trade dress referring to "LOU!S!ANA" in the Louisiana Service Mark by substantially copying the use of the exclamation point, the color, font and style of the Louisiana Service Mark, all of which is more fully shown as Exhibit "E", attached to the *Dardenne Affidavit*. His concern for the confusion caused by the Billboard has been amplified by the use of the Billboard by MoveOn.org in television advertisements.

The Lieutenant Governor immediately consulted with his staff about the unauthorized use of the Service Marks. Thereafter, he instructed general counsel for the Department of Culture, Recreation and Tourism to issue a written cease and desist demand to MoveOn.org whereby his concerns regarding confusion were articulated, all of which is more fully shown as Exhibit "F",

5

attached to the *Dardenne Affidavit*. The cease and desist demand was rejected by MoveOn.org, all as more fully shown as Exhibit "G", attached to the *Dardenne Affidavit*.

The statutory mandates for the Office of the Lieutenant Governor and the Department of Culture, Recreation and Tourism have nothing to do with the issue of Medicaid expansion under the Affordable Care Act. In fact, the decision to accept or reject the Medicaid expansion rests with the Governor, not with the Lieutenant Governor. [*Dardenne Affidavit*].

The Lieutenant Governor strongly supports MoveOn.org's right to free speech secured by the First Amendment of the Constitution of the United States of America and the notion that MoveOn.org should be free to criticize the State of Louisiana, the Governor, or any elected official on whatever issue it deems important. However, the use of the Service Mark by MoveOn.org in the manner in which it is incorporated in their Billboard and television advertisement is in direct violation of Louisiana and Federal law, and should not be allowed.

### *Discussion*

I.  **The Standard for Obtaining a Preliminary Injunction**:

An injunction is an equitable remedy. "The basis for injunctive relief (preliminary or permanent) in the federal courts has always been irreparable injury and the inadequacy of legal remedies." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312, 102 S.Ct. 1798, 1803 (1982); *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 61, 95 S.Ct. 2069, 2077 (1975). The primary purpose of a preliminary injunction is to preserve the status quo pending a determination of the action on its merits. *Chalk v. United States Dist. Ct. Cent. Dist. of Calif.,* (9 Cir. 1988) 840 F.2d 701, 704.

In each case, a court must balance the competing claims of injury and must consider the

effect on each party of granting or withholding of the requested relief. Although particular regard should be given to the public interest ... a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law. *Ammoco Production Company v. Village of Gambell, Alaska,* 480 U.S. 531, 541, 107 S.Ct. 1396, 1402 (1987); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 305, 102 S.Ct. 1798, 1799 (1982).

A preliminary injunction is an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22, 129 S.Ct. 365, 376 (2008); *See* also *Earth Island Inst. v. Carlton,* 626 F.3d 462, 469 (9th Cir. 2010).

Congress may intervene and provide for the exercise of the court's discretion in an injunction matter on a lesser showing. However, unless the statute, in so many words, or by necessary and inescapable inference, requires a departure from the long accepted rules of equitable practice, such changes will not be inferred. *Ebay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391, 126 S.Ct 1837, 1839 (2006) (Nothing in Patent Act indicates Congress intended a departure from traditional equitable principals); *Weinberger v. Romero-Barcelo* 456 U.S. 305, 314, 320, 102 S.Ct. 1798, 1804, 1807 (1982).

As such, the use of presumptions or categorical rules in issuing injunctive relief would be a "major departure from the long tradition of equity practice" and "should not be lightly implied." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 393, 126 S. Ct. 1837, 1840-41 (2006) (citations omitted); *Perfect 10, Inc., v. Google, Inc.,* 653 F.3d 979-980 (9th Cir. 2011).

Thus "courts must analyze each statute separately to determine whether Congress intended to make a 'major departure from the long tradition of equity practice and create a statutory

presumption or categorical rule for the issuance of injunctive relief.'" *Perfect 10, Inc., v. Google, Inc.,* 653 F.3d 976, 981 (9th Cir. 2011) footnote 2.

In addition to the requirements for equitable relief, generally, under the "traditional tests" a plaintiff seeking a preliminary injunction must establish:

- that he is likely to succeed on the merits;
- that he is likely to suffer irreparable harm in the absence of preliminary relief;
- that the balance of equities tips in his favor; and
- that an injunction is in the public interest.

*Winter v. Natural Resources Defense Council, Inc.*, *supra*, 555 U.S. at 20, 129 S.Ct. at 374 (2008).

This four part "traditional test" has been held to apply whenever preliminary injunctive relief is sought. *Id.* (to enjoin U.S. Navy from violation of environmental laws); *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391, 126 S. Ct. 1837, 1839 (2006) (to enjoin patent or copyright infringement). Historically, along with the "traditional tests" set forth above, many courts utilized an alternative test, allowing preliminary injunctive relief upon a showing of either:

- a combination of probable success on the merits and the possibility of irreparable injury if injunctive relief is denied or
- the likelihood of success was such that "serious questions going to the merits were raised and the balance of hardships tipped sharply in plaintiff's favor." *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-1132 (9th Cir. 2011); *See* also *City Group Global Markets, Inc. v. VCG Special Opportunities Master Fund Limited,* 598 F.3d 30, 36 (2nd Cir. 2010), footnote 5 (noting that prior to *Winter* majority of circuits applied "sliding scale" approach.)

Insofar as the "sliding scale" test allowed injunctive relief upon the mere possibility of irreparable injury to plaintiffs, it was expressly overruled by *Winter*, which requires a likelihood of irreparable injury in every case. *Stormans, Inc., v. Selecky,* 586 F.3d 1109, 1127 (9th Cir. 2009).

Lower courts appear to be somewhat in conflict as to whether *Winter* rejects other applications of the "sliding scale" test; in particular, whether relief can be granted because the

Case 3:14-cv-00150-SDD-SCR   Document 2-1   03/14/14   Page 8 of 28

potential harm to plaintiff outweighs the potential harm to defendant, or because of "serious questions" going to the merits coupled with a "balance of hardships" favoring plaintiff. One circuit holds *Winter* invalidates the "sliding scale" approach altogether. A balance of hardships is not enough; nor are "serious questions going to the merits." Rather a clear likelihood of success is required in every case. *Real Truth About Obama, Inc., v. Federal Election Commission,* 575 F.3d 342, 347 (4 Cir. 2009) *cert. granted, judgment vacated on other grounds*, 559 U.S. 1089, 130 S. Ct. 2371 (2010); *Sherley v. Sebelius,* 644 F.3d 388, 392-393 (D.C. Cir. 2011) (*Winter* at least "suggests" entire sliding scale approach rejected); *Quiroga v. Chen*, 735 F.Supp. 2d 1226, 1229 (D. Nev. 2010) (Even on the sliding scale approach "chance of success on the merits cannot be weaker than 'likely'").

Other circuits have found that some form of the "sliding scale" approach survives *Winter*. *See Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-1132 (9th Cir. 2011) (Serious questions going to "merits" and a "balance of hardships that tip sharply toward" the plaintiff can support a preliminary injunction.) *See* also *City Group Global Markets, Inc. v. VCG Special Opportunities Master Fund, Limited*, 598 F.3d 30, 38 (2nd Cir. 2010); *Hoosier Energy Rural Electric Co-Op, Inc. v. John Hancock Life Insurance* Company, 582 F.3d 721, 725 (7 Cir. 2009) (Weaker claim on the merits can be offset by "net harm an injunction can't prevent.")

Regardless of what formulation is applied, to obtain a preliminary injunction, the plaintiff must show that it is "likely" to prevail on the merits. *Winter v. Natural Resources Defense Council, Inc.*, *supra*, 555 U.S. at 20, 129 S.Ct. at 374 (2008); *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1 Cir. 1996) ("[L]ikelihood of success" is the "main bearing wall" of the traditional test.) *See* also *Quiroga v. Chen*, *supra*, 735 F.Supp. 2d at 1229 (D. Nev. 2010).

9

A preliminary injunction is customarily granted on the basis of procedures less formal and evidence less complete than at trial. Therefore, the moving party need not prove his or her case in full at a preliminary injunction hearing. *University of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 1834 (1981); *Byrum v. Landreth*, 566 F.3d 442, 446 (5th Cir. 2009) (Plaintiff's evidence need not meet summary judgment standards).

The burdens of proof at the preliminary injunction stage "track the burdens at trial." Thus, once the moving party has carried its burden of showing a likelihood of success on the merits, the burden shifts to the non-moving party to show a likelihood that its affirmative defense will succeed. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal* 546 U.S. 418, 429, 126 S.Ct. 1211, 1219 (2006); *Perfect 10, Inc. v. Amazon.com, Inc.*, *supra*, 508 F.3d at 1158 (9th Cir. 2007).

On a motion for a preliminary injunction in a copyright infringement action where the defendant has raised "fair use" as a defense, defendant has the initial burden of introducing evidence showing "fair use." Only after defendant has done so is plaintiff obligated to show it is likely to overcome the "fair use" defense. *Perfect 10, Inc. v. Amazon.com, Inc.*, *supra*, 487 F.3d at 714 *amended and superseded on reh'g*, 508 F.3d 1146 (9th Cir. 2007). There is no reason the burden of proof should be any different in a trademark case.

Some courts hold that "likelihood" means better than a 50% chance of prevailing on the merits (*i.e.*, success on the merits must be "more likely than not). *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1379 (Fed. Cir. 2009); *Eskridge Research Corp. v. United States*, 92 Fed. Cl. 88, 97 (Fed. Cl. 2010); *See also Muhammad v. Reno,* 309 F.3d 95, 102 (2nd Cir. 2002) ("[D]efining 'less than a likelihood of success' to mean something less than 50%" and "more likely than not" to mean a "likelihood ... (of) more than 50%).

Case 3:14-cv-00150-SDD-SCR   Document 2-1   03/14/14   Page 10 of 28

Other courts hold that a preliminary injunction may be granted even if it cannot be determined to a certainty that the moving party is more likely than not to prevail on the merits if "the cost outweigh the benefits of not granting the injunction." *City Group Global Markets, Inc. v. VCG Special Opportunities Master Fund, Limited*, 598 F.3d 30, 35 (2nd Cir. 2010); *Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3rd Cir. 2011) ("[A] 'likelihood' does not mean more likely than not"); *See Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir. 2011) (Requirement of likelihood of success for stay of removal and deportation appeal does not require showing that success on the merits is "more likely than not").

Unless Congress provides otherwise, a plaintiff seeking a preliminary injunction must demonstrate that irreparable injury is likely in the absence of injunction. *See Winter v. Natural Resources Defense Council, Inc.*, *supra*, 555 U.S. at 22, 129 S.Ct.at 375 (2008); *See also Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2nd Cir. 2005) (Irreparable injury is "the single most important prerequisite for the issuance of a preliminary injunction"). A preliminary injunction may not be granted on a "possibility" of irreparable harm, even if plaintiffs demonstrate a strong likelihood of prevailing on the merits. This is because injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22, 129 S.Ct. 365, 375-376 (2008); *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Plaintiff must demonstrate "immediate threat and harm." *Society of Separationists, Inc. v. Herman*, 959 F.2d 1283, 1285 (5th Cir. 1992).

While likelihood is required, the "alleged harm need not be occurring or be certain to occur" before a court can grant a preliminary injunction. *United States v. Emerson*, 270 F.3d 203, 262 (5th

11

Cir.2001).

When a plaintiff suffers "substantial injury that is not accurately measurable or adequately compensable by money damages, irreparable harm is a natural sequel." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 18 (1 Cir. 1996). A legal remedy need not be wholly and effectual. Rather, it must be "seriously deficient as compared to the harm suffered." *Food Comm International v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003).

Prior to *Winter* irreparable harm was presumed where defendants engaged in acts prohibited by a statute that provides for injunctive relief. *United States v. Hayes International Corp.*, 415 F.2d 1038, 1045 (5th Cir.1969). In the aftermath of *Winter*, however, courts have held it is improper to automatically presume irreparable injury "simply because a defendant violates a statute that authorizes injunctive relief." *Park Village Apartment Tenants Association v. Mortimer Howard Trust*, 636 F.3d 1150, 1162 (9th Cir. 2011).

It has been held that in patent cases, the mere ownership of an infringed patent may not support a finding of irreparable injury. Instead, to establish irreparable injury, evidence may have to be produced involving such factual issues as whether the parties are in direct competition, lost market share and how key the infringement is to the defendant's product. *See z4 Technologies, Inc. v. Microsoft Corp.*, 434 F. Supp. 2d 437, 440 (E.D. Tex. 2006).

Thus while it may be that certain statutory violations will usually cause irreparable injury, "the plaintiff must still make that showing on the facts of this case and cannot rely on a presumption to do it for him." *Flexible Lifeline Systems, Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 998 (9th Cir. 2011).

Presuming irreparable injury is also at odds with *Winter's* rejection of the former standard

12

permitting a preliminary injunction on the mere "possibility" of irreparable injury as being "too lenient." *Winter v. Natural Resources Defense Council, Inc.*, *supra*, 555 U.S. at 22, 129 S.Ct. at 367 (2008). If "possibility of irreparable harm, is 'too lenient', then surely the standard which presumes irreparable harm without requiring any showing at all is also 'too lenient.'" *Flexible Lifeline Systems, Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 997 (9th Cir. 2011) (presuming irreparable harm in copyright cases improper after *eBay* and *Winter*.) In a variety of cases, courts have questioned or flat out reversed long standing case law that allowed irreparable injury to be presumed upon a showing of success on the merits including in the following context:

- Trademark infringement and unfair competition. *CytoSport, Inc. v. Vital Pharm., Inc.*, 617 F. Supp. 2d 1051, 1065 (E.D. Cal. 2009) *aff'd*, 348 F. App'x 288 (9th Cir. 2009); *See* Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc., 645 F.3d 26, 33 (1st Cir. 2011) (Noting but not resolving the issue); *Paulsen Geophysical Services, Inc. v. Sigmar*, 529 F.3d 303, 1313 (5th Cir. 2008).

- Copyright infringement. *Perfect 10, Inc. v. Google, Inc.*, *supra*, 653 F.3d at 979; *Salinger v. Colting*, 607 F.3d 68, 79 (2nd Cir. 2010).

Nevertheless, while it may be improper for the court to "presume" irreparable injury, in some cases it may still be that once the injury is established it will, as a factual matter, almost always be deemed irreparable. Even so, some factual showing is undoubtedly necessary. "We appreciate the key distinction that although some injuries may usually be irreparable and thus a likelihood of irreparable injury easily shown, the plaintiff must still make that showing on the facts of this case and cannot rely on a presumption to do it for him." *Flexible Lifeline Systems, Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 998 (9th Cir. 2011).

The First Amendment has been interpreted to limit court power to restrain speech or press rights. Absent the most extraordinary circumstances, courts will not restrain the anticipated exercise

13

of these rights. *Near v. State of Minnesota ex rel. Olson*, 283 U.S. 697, 722-723, 51 S.Ct. 625, 633 (1931); *Tory v. Cochran*, 544 U.S. 734, 737, 125 S.Ct. 2108, 2111 (2005). The threshold question in such cases is whether the injunction, taken as a whole is content based or content neutral, *i.e.,* justified without reference to the content of the regulated speech. If the latter, an injunction will be permitted if it burdens "no more speech than necessary to serve a significant government interest." *Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, 765, 114 S.Ct. 2516, 2525 (1994); *Schenck v. Pro-Choice Network of Western New York*, 519 U.S. 357, 372-374, 117 S.Ct. 855, 864-865 (1997); *See Dr. Suess Enterprises, L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1403 (9th Cir. 1997), footnote 11 (Trademark enforcement by prohibitory injunction is "content neutral" and therefore does not trigger prior restraint concerns).

In light of the time constraints involved, courts generally permit counsel some leeway in how the facts supporting the application are set forth. The normal method is declarations or affidavits. But deposition testimony and other forms of verified discovery or pleadings may also be used. *Sierra Club, Lone Star Chapter v. FDIC*, 992 F.2d 545, 551 (5th Cir. 1993); *University of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 1834 (1981) (Preliminary injunction may be based on evidence less complete than in trial on the merits).

Because of the urgency involved, evidence supporting the application need not conform to the standards for a summary judgment motion or to the federal rules of evidence. *Sierra Club, Lone Star Chapter v. FDIC*, 992 F.2d 545, 551 (5th Cir 1993) (Inadmissable hearsay can support preliminary injunction). A preliminary injunction may be granted "on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits."*University of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 1834 (1981); *University of Texas v. Camenisch*,

14

451 U.S. 390, 395, 101 S.Ct. 1830, 1834 (1981). Because a preliminary injunction is an extraordinary remedy, courts require the movant to carry its burden of persuasion by a "clear showing." *Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S.Ct. 1865, 1867 (1997); *Okpalobi v. Foster*, 190 F.3d 337, 342 (5th Cir. 1999).

**II.    _Trademark Infringement Under Louisiana Law_:**

The primary issues in a trade name infringement case in Louisiana are (1) whether the party seeking the injunction has a protectable proprietary right in the name it seeks to exclude others from using, and (2) if so, whether there has been an infringement of that right. *Gulf Coast Bank v. Gulf Coast Bank & Trust Co.*, 94-2203 (La. 4/10/95), 652 So.2d 1306, 1309.

In determining whether one has a protectable trademark, actual use of a mark gives rise to a protectable proprietary interest in the mark. *Id*. at 1313. The Louisiana Trademark Act, La. R.S. 51:211 *et seq*, requires use of the trademark before registration is permitted. *Id*. "Use alone, however, does not create a protectable proprietary interest; the trademark or trade name must be distinctive, either by being inherently distinctive or by having acquired distinctiveness through secondary meaning." *Id*.

The distinctiveness of a trademark has been determined by Louisiana courts by dividing trademarks into four categories: (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful. *Id*. "A generic term is the name of a particular genus or class of which an individual article, service, or business is but a member." *Id*. "Generic terms are considered to be in the public domain and are not susceptible to appropriation for exclusive use and thus are not given trademark or trade name protection." *Gulf Coast Bank v. Gulf Coast Bank & Trust Co.*, *supra*, 652 So.2d at 1313. "A descriptive term identifies a characteristic or quality of an article, service, or business." *Id*.

15

"Though ordinarily not protectable, a descriptive name may become a valid, protectable trade name if it acquires a secondary meaning." *Id*. Included in the category of descriptive terms which must have secondary meaning in order to be afforded protection as a trade name are geographic terms. *Id*. at 1314. A suggestive term suggests, rather than describes, a characteristic of the goods, services, or business and requires an effort of the imagination by the consumer in order to draw a conclusion as to the nature of the goods, services, or business. *Id*. Suggestive marks or names need not acquire secondary meaning to be protected. Arbitrary or fanciful terms bear no relationship to the product, service, or business to which it applies. *Id*. Arbitrary and fanciful marks or names, like suggestive ones, are considered inherently distinctive and are accorded protection without having to prove secondary meaning. *Gulf Coast Bank v. Gulf Coast Bank & Trust Co.*, 94-2203 (La. 4/10/95), 652 So.2d 1306, 1314.

The First Circuit Court of Appeal for Louisiana found in *Inka's S'Coolwear, Inc. v School Time, LLC*, 97-2271 (La.App. 1 Cir. 11/6/98), 725 So.2d 496 that the term "S'COOLWEAR" was neither suggestive, arbitrary, or fanciful "because a consumer upon hearing the name could reasonably infer, without imagination, the type of business in which the appellant was engaged in, i.e., school products or school clothing." *Inka's S'Coolwear, Inc. v School Time, LLC*, 97-2271 (La.App. 1 Cir. 11/6/98), 725 So.2d 496, 501.

The Louisiana Fifth Circuit Court of Appeal asserted that "whenever a word or phrase naturally directs attention to the qualities, characteristics, effect, or purpose of the product or service, it is descriptive and cannot be claimed as an exclusive trade name." *Radiofone, Inc. v. Mobile-One Sound, Inc.*, 628 So.2d 95, 98 (La.App. 5th Cir. 1993).

In the instant case, the Plaintiff has a protectable proprietary interest in the Service Mark with

Case 3:14-cv-00150-SDD-SCR   Document 2-1   03/14/14   Page 16 of 28

respect to which it is entitled to protection (1) against infringement pursuant to La.R.S. 51:222; and (2) against dilution pursuant to La.R.S. 51:223.1. *Gulf Coast Bank*, supra, 652 So.2d at 1312. The Office of the Lieutenant Governor has extensively used the Service Mark on a local, national and international basis. Additionally, the Service Mark has been duly registered with the Louisiana Secretary of State's Office. As stated above, use alone does not give rise to a protectable proprietary interest.

The Service Mark owned by the Office of the Lieutenant Governor squarely falls within the suggestive category of inherently distinctive and highly protected marks. The Service Mark reads, "Louisiana Pick Your Passion." The words Pick Your Passion suggest, not describe, the culturally rich and diverse Louisiana way of life. The Service Mark lends itself to the consumer to determine what their particular passion is and that it is capable of being found and experienced in the State of Louisiana. The words "Pick Your Passion" do not describe, hunting, fishing, the culinary arts, music, water sports, etc., all of which are being advertised and which encourage the reader to imagine. "Pick your passion" could refer to a seemingly unlimited number of things such as products, services, things, food, places, beverages, sports, hobbies, vocations, occupations, books, games, entertainment, family, etc.

Conversely, the Service Mark, "Louisiana Pick Your Passion," can not be determined to be descriptive in nature. In order for the Service Mark to qualify within the descriptive category, a consumer upon hearing the name could reasonably infer, without imagination, the type of business in which the holder of the mark is engaged. One cannot reasonably assert that "Pick Your Passion" describes the culturally rich heritage of Louisiana without the necessity of the consumer turning to his own imagination to determine what that term means and infers.

17

Thus, the Service Mark, "Louisiana Pick Your Passion," is suggestive and inherently distinctive. ***As such, under Louisiana law, there need not be a showing of a likelihood of confusion***. *Gulf Coast Bank v. Gulf Coast Bank & Trust Co.*, 94-2203 (La. 4/10/95), 652 So.2d 1306.

"The concept of 'secondary meaning' recognizes that words with an ordinary or primary meaning of their own, may, by long use with a particular product, service or business, come to be known by the public as specifically designating that particular product, service or business, and thereby rise to the level of a fully protected trademark or trade name." *Gulf Coast Bank v. Gulf Coast Bank & Trust Co.*, 94-2203 (La. 4/10/95), 652 So.2d 1306, 1314.

Proof of a secondary meaning may consist of, among other things, direct evidence such as testimony from individual consumers, surveys, proof of actual instances of confusion, or indirect evidence such as the volume of business done under the name, the length of time the designation has been in use, advertising and promotional efforts, and the conspicuousness of the designation. *Id*.

Under Louisiana law, "[w]here one relies on secondary meaning to establish the distinctiveness of the name, in order to enjoin another's use of similar name, proof of likelihood of consumer confusion is required." (Emphasis Added). *Louisiana Granite Yard, Inc. v. LA Granite Countertops, LLC*, 45,482 (La.App. 2 Cir. 8/18/10), 47 So.2d 573, 582; *Gulf Coast Bank v. Gulf Coast Bank & Trust Co.*, *supra*, 652 So.2d at 1319-1320.

Generally, when determining whether there is a likelihood of confusion, several non-exhaustive factors are reviewed, which are: (1) similarity of products; (2) identity of retail outlets and purchasers; (3) identity of advertising media; (4) strength of distinctiveness of the mark or name; (5) defendant's intent; (6) similarity of design; (7) and actual confusion. *Gulf Coast Bank v. Gulf*

*Coast Bank & Trust Co.*, *supra*, 652 So.2d at 1306, 1320.

In the instant case, a likelihood of confusion is present, although not required under Louisiana law due to the suggestive nature of the Service Mark. Here, the similarity of the Billboard and the Service Mark are clear and cannot reasonably be in question; both use the same font, the same color, and virtually the same use of an exclamation point instead of the letter I in the word "Louisiana."

Further, the Service Mark has been in use for three years by the Office of the Lieutenant Governor. Additionally, the Office of the Lieutenant Governor and the Department of Culture, Recreation and Tourism has spent nearly seventy million dollars in marketing and promoting the Service Mark on an international level by means of television advertisements, magazine advertisement, sponsorship of events, etc. [See *Dardenne Affidavit*].

Thus, due to the use of the Service Mark by the Office of the Lieutenant Governor for several years and spending tens of millions of dollars in marketing and promoting the Service Mark, the Service Mark has acquired a secondary meaning so as to become known by the public.

Therefore, this Honorable Court should issue a preliminary injunction that enjoins MoveOn.org from infringing on the Service Mark of the Office of the Lieutenant Governor and mandating the removal of all billboards, television advertisements, and any other media or medium, or the pertinent parts thereof, that use a colorable imitation of the Service Marks.

## III.   *Trademark Infringement Under Federal Law*:

There are two elements to a successful infringement claim under the Lanham Act: (a) proof of "ownership in a legally protectible mark," and (b) proof of a likelihood of confusion. *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 235-236 (5th Cir.2010).

A valid trademark registration is *prima facie* evidence that a mark is valid and that the owner

Case 3:14-cv-00150-SDD-SCR   Document 2-1   03/14/14   Page 19 of 28

of the mark has the exclusive right to use the mark, but the presumption of validity that is created may be rebutted by proof that the mark is not inherently distinctive. (Emphasis Added). *Id*. at 237.

Federal courts often utilize the *Abercrombie* test to determine the distinctiveness of a word mark *Id*. The *Abercrombie* test creates five categories, ranked from least to most distinctive: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; and (5) fanciful. *Amazing Spaces, Inc.*, 608 F.3d at 240. A generic mark is not legally protectable, and a descriptive mark is only protectable when it has gained secondary meaning. *Id*.

"A generic term refers to a particular genus or class of which an individual article or service is but a member." *Texas Pig Stand, Inc. v. Hard Rock Café Int'l, Inc.*, 951 F.2d 684, 692 (5th Cir.1992). A generic term connotes the basic nature of an article or service rather than the more individualized characteristics of a particular product. *Amazing Spaces, Inc.*, 608 F.3d at 241. The more common method of determining whether a term is generic is to ask whether the public perceives the term primarily as the designation of the article.

"A descriptive term identifies a characteristic or quality of an article or service, such as its color, odor, function, dimensions, or ingredients. . . ." *Zatarain's, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 795 (5th Cir.1983). A descriptive mark is only protectable if the mark has taken on a secondary meaning. *Id*.

"Secondary meaning occurs when, in the minds of the public, the primary significance of a mark is to identify the source of the product rather than the product itself." *Amazing Spaces, Inc.*, 608 F.3d at 247. The relevant factors to the secondary meaning inquiry are: (1) length and manner of use of the mark or trade; (2) volume of sales; (3) amount and manner of advertising; (4) nature of use of the mark or trade dress in newspapers and magazines; (5) consumer-survey evidence; (6)

Case 3:14-cv-00150-SDD-SCR   Document 2-1   03/14/14   Page 20 of 28

direct consumer testimony; and (7) the defendant's intent in copying the trade dress. *Id*. at 248; *Board of Supervisors for Louisiana State University Agricultural and Mechanical College et al v. Smack Apparel Co. et al*, 550 F.3d 465, 476 (5th Cir.2008).

The primary focus of this inquiry is the effectiveness of the trademark owner's efforts, not the extent. *Zatarain's Inc.*, 698 F.2d at 795.

Terms that are arbitrary or fanciful bear no relationship to their associated products or services *Soweco Inc. v. Shell Oil Co.*, 617 F.2d 1178, 1184 (5th Cir.1980). A mark is suggestive if it suggests, but not describes, an attribute of the good; it requires the consumer to exercise his imagination to apply the trademark to the good. *Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 227 (5th Cir.2009).

In the instant case, as articulated above, the Service Marks are of a suggestive nature. The words "Louisiana Pick Your Passion" incite the imagination of the consumer. It inherently asks the reader of the words what their passion is and suggests that such passion, whatever it may be, is capable of being enjoyed within the State of Louisiana. The overwhelming necessity of the reader to use his imagination in determining the meaning of the Service Mark dictates that it be categorized as a suggestive mark. As such, the Service Mark is inherently distinctive and is thus a protectable trademark.

Once a plaintiff shows ownership in a protectable trademark, he must next show that the defendant's use of the mark "creates a likelihood of confusion in the minds of potential customers as to the source, affiliation, or sponsorship" of the product at issue. *Board of Supervisors for Louisiana State University Agricultural and Mechanical College et al*, 550 F.3d at 478.

Likelihood of confusion is synonymous with a probability of confusion, which is more than

a mere possibility of confusion. *Id*. When assessing the likelihood of confusion, the courts consider a non-exhaustive list of so-called "digits of confusion, " which include: (1) the type of mark allegedly infringed; (2) the similarity between the two marks; (3) the similarity of the products or services; (4) the identity of the retail outlets and purchasers; (5) the identity of the advertising media used; (6) the defendant's intent; (7) any evidence of actual confusion; and (8) the degree of care exercised by potential purchasers. *Id*. "No single factor is dispositive, and a finding of a likelihood of confusion need not be supported by a majority of the factors." *Id*.

In the instant case, as stated above under state law grounds, there is a high probability of confusion between the Service Marks and the Billboard. MoveOn.org used a virtually identical font, color, and design to imitate the Service Marks so as to confuse the reader as to the author or source of the Billboard.  It also appropriated trade dress from the Department of Culture, Recreation and Tourism website, including colors used and use of the photograph of crawfish on a plate which is a copy of the photo that appears on the Department's website.  See the comparison photo attached hereto as Exhibit "B" hereto, showing the Billboard and pages from the Department's website.

MoveOn.org's extensive imitation of the Service Mark is no coincidence; it is capitalizing on the confusion created by the imitation. Further, MoveOn.org de-emphasized the authorship of the Billboard in order to draw the attention of the reader to the artwork and message therein.   See the Affidavit of Eric Morgan attesting to the average time for a driver on an interstate highway to notice and read a billboard, attached hereto as Exhibit "C."

The fair-use doctrine provides that one who has lawfully copied another's product can tell the public what he has copied. *Board of Supervisors for Louisiana State University Agricultural and Mechanical College et al*, 550 F.3d at 488. It also permits one to use another's mark truthfully to

Case 3:14-cv-00150-SDD-SCR   Document 2-1   03/14/14   Page 22 of 28

identify another's goods or services in order to describe or compare its product to the markholder's product. *Id*. "The right of fair use is limited, however, insofar as the use cannot be one that created a likelihood of confusion as to source, sponsorship, affiliation, or approval." *Id*. (Internal Citations Omitted).

The Fifth Circuit has held that a nominative fair use claim is a claim that a mark's use is non-infringing and therefore creates no likelihood of confusion. *Id*. at 488-489. Thus, a court ordinarily should consider a nominative fair use claim in conjunction with its likelihood-of-confusion analysis in order to avoid lowering the standard of confusion. *Id*.

"In order to avail oneself of the nominative fair use defense the defendant (1) may only use so much of the mark as necessary to identify the product or service and (2) may not do anything that suggests affiliation, sponsorship, or endorsement by the markholder." *Id*.

"In general, a parody is defined as an artistic work that imitates the characteristic style of an author or a work for comic effect or ridicule." *Lyons Partnership v. Giannoulas*, 179 F.3d 384, 388 (5th Cir.1999). A reference to a "trademark may be permissible if the use is purely for parodic purposes." *Id*. To the extent the original work must be referenced in order to accomplish the parody, that reference is acceptable. *Id*.

It is important to note, **"the fact that conduct is a parody is not an affirmative defense to trademark infringement, a parody should be treated differently from other uses that infringe on a trademark**." (Emphasis Added). *Id*. at 389-390. "While it is only one factor to consider, it is a factor that must be considered in conjunction with all of the other digits of confusion. *Id*. (i.e., the factors for determining the likelihood of confusion). When a parody makes a specific, ubiquitous trademark the brunt of its joke, the use of the trademark for satirical purposes affects the court's

23

analysis of the factors to consider when determining whether the use is likely to result in consumer confusion. *Id*. at 390.

The First Amendment may offer little protection for a competitor who labels its commercial good with a confusingly similar mark, but "trademark rights do not entitle the owner to quash an unauthorized use of the mark by another who is communicating ideas or expressing points of view." *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 900 (9th Cir.2002). (Internal Citations Omitted). The court in *Mattel* stated that "[w]ere we to ignore the expressive value that some marks assume, trademark rights would grow to encroach upon zone protected by the First Amendment." *Id*. That court stated, in citing *Yankee Publ'g Inc. v. News Am. Publ'g, Inc.*, F.Supp. 267, 276 (S.D.N.Y.1992), that "[w]hen unauthorized use of another's mark is part of a communicative message and not a source identifier, the First Amendment is implicated in opposition to the trademark." *Id*.

However, the Ninth Circuit in *Mattel* drew a distinction between targeting the holder of the trademark and another subject. *Id*. at 901. In that case, Mattel, the holder of the trademark to the Barbie Doll, sued to enforce its trademark from infringement from MCA Records, who produced a song that mocked the Barbie Doll. That court stated that "[t]he song does not rely on the Barbie mark to poke fun at another subject but targets Barbie herself." *Id*. The court in *Mattel* distinguished itself from *Dr. Seuss Ents., LP v. Penguin Books USA, Inc.*, 109 F.3d 1394 (9th Cir.1997). The *Mattel* Court summarized the holding of *Dr. Seuss* as follows:

> This case is therefore distinguishable from *Dr. Seuss*, where we held that the book *The Cat NOT in the Hat!* borrowed Dr. Seuss's trademarks and lyrics to get attention rather than to mock *The Cat in the Hat!* The defendant's use of the Dr. Seuss trademarks and copyrighted works had "no critical bearing on the substance or style of" *The Cat in the Hat!*, and therefore could not claim First Amendment protection.

24

*Dr. Seuss* recognized that, where an artistic work targets the original and does not merely borrow another's property to get attention, First Amendment interest weigh more heavily in the balance.

*Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 901 (9th Cir.2002). (Internal Citations Omitted).

The Supreme Court provided the following in relation to the use of parody and satire to infringe upon trademark and copyright material:

For the purposes of copyright law, the nub of the definitions, and the heart of any parodist's claim to quote from existing material, is the use of some elements of a prior author's composition to create a new one that, at least in part, comments on that author's works. **If, on the contrary, the commentary has no critical bearing on the substance or style of the original composition, which the alleged infringer merely uses to get attention or to avoid the drudgery in working up something fresh, the claim to fairness in borrowing from another's work diminishes accordingly** (if it does not vanish), and other factors, like the extent of its commerciality, loom larger. Parody needs to mimic an original to make its point, and so has some claim to use the creation of its victim's (or collective victims') imagination, whereas satire can stand on its own two feet and so requires justification for the very act of borrowing.

(Emphasis Added).*Campbell v. Acuff-Rose Music Inc.*, 510 U.S. 569, 580-581 (1994).

Here, the Office of the Lieutenant Governor is very cognizant of and respectful of the importance of preserving the right to free speech as secured by the First Amendment of the Constitution of the United States of America. However, such free speech right to parody is not dispositive in this case.

As required by the Supreme Court and articulated by Courts of Appeal, parody is defined as an artistic work that uses, as part of its composition, the mark of another to ridicule the author of the mark. Critical to this analysis is that the target of MoveOn.org is not the Office of the Lieutenant Governor; rather, it is the Office of the Governor, which is a separate and distinct office of the Executive Branch of the State of Louisiana. Despite both offices being constituents of the Executive

Branch, the authorship and property interest held by the Office of the Lieutenant Governor is not imputable to the Office of Governor. *Ward v. State, Dept. Of Transp. & Development*, 43,948 (La.App. 2 Cir. 1/28/09), 2 So.3d 1231. Similarly and analogously, the right of the Department of Natural Resources to conserve the minerals within Louisiana is not a right that is imputable to the Commissioner of Insurance. Thus, by definition, MoveOn.org's imitation of the Service Mark cannot be protected by a claim of parody. See *Dr. Seuss Ents., LP v. Penguin Books USA, Inc.*, 109 F.3d 1394 (9th Cir.1997) and *Campbell v. Acuff-Rose Music Inc.*, 510 U.S. 569, 580-581 (1994).

Further, "a true parodist does not intend to create a likelihood of confusion, because the very nature of the parody is to distinguish itself from the parodied subject matter and present a different, and usually opposing, point of view."[1] Here, MoveOn.org is not presenting an opposing point of view to that of the Office of the Lieutenant Governor because the Office of the Lieutenant Governor does not deal with nor does it have a position on the expansion of Medicaid coverage under the Affordable Care Act. Thus, the target of the Billboard could not be The Office of the Lieutenant Governor or the Department of Culture, Recreation and Tourism. Simply put, MoveOn.org has missed the mark with its attempted parody, and rather, infringed upon the Service Mark, in violation of the Lanham Act, in an attempt to lambast the Office of Governor.

Moreover, even if this Court should determine that the imitation qualifies as parody, then the use of the Service Mark is still outside the permissible bounds of parody. MoveOn.org has used substantially more of the Service Mark than is necessary to achieve its parody. See *Lyons Partnership v. Giannoulas*, 179 F.3d 384, 388 (5th Cir.1999). MoveOn.org went to extraordinary care

---

[1]Kerry L. Timbers and Julia Huston, *The "Artistic Relevant Test" Just Because Relevant: The Increasing Strength of the First Amendment as a Defense to Trademark Infringement and Dilution*, 93 Trademark Rep. 1278, 1300 (2003).

Case 3:14-cv-00150-SDD-SCR   Document 2-1   03/14/14   Page 26 of 28

to imitate the likeness of the Service Mark, which was not necessary to achieve its parodic goal.

The extensive and exclusive use of the Service Marks by the Department for over three years has generated a recognizable brand associated with the Service Marks, which MoveOn.org is capitalizing on by drawing attention to their political statement through the use of the Service Marks which leads the reader to believe the message is a promotion by the Department of Culture, Recreation and Tourism, i.e. through confusion of the viewing public as to the source of the Billboard message. Given the limited time an advertiser has to catch the attention of a driver on the interstate highway (an average of six seconds), this represents an unreasonable and unauthorized misappropriation of the Service Marks to draw attention to the defendant's message. See the Affidavit of Eric Morgan attesting to the average time for a driver on an interstate highway to notice and read a billboard, attached hereto as Exhibit "C". This situation is clearly akin to the context described by the Supreme Court in *Campbell v. Acuff-Rose Music Inc.*, supra, 510 U.S. at 580-581 as "commentary [which] has no critical bearing on the substance or style of the original composition, which the alleged infringer merely uses to get attention or to avoid the drudgery in working up something fresh." As noted by the Supreme Court there, under such circumstances, "the claim to fairness in borrowing from another's work diminishes accordingly (if it does not vanish)." *Campbell v. Acuff-Rose Music Inc.*, 510 U.S. 569, 580-581 (1994).

### Conclusion

It is therefore in the interest of justice, and required by the Louisiana law and Federal law, that Defendant, MoveOn.org, be enjoined from the use of The Office of The Lieutenant Governor's Service Marks since such use in the period of time before trial is causing the holder of the service mark to suffer irreparable harm. Accordingly, the Department of Culture, Recreation and Tourism

Case 3:14-cv-00150-SDD-SCR   Document 2-1   03/14/14   Page 27 of 28

is entitled to issuance of a preliminary injunction herein, to remain effective during the pendency of these proceedings:

(a) Prohibiting MoveOn.org from using anything other that the mere words contained in the Service Mark, thus prohibiting the use of the font style, the substitution of exclamation points for the letter "I" in the word "Louisiana", the copy of the photograph of the plate of crawfish taken from the Department's website, and art work and colors that are taken from the Service Mark.; and

(b) Ordering the removal of all billboards or the portion thereof, or other reproduction of any image or the portion thereof that is a substantial and colorable imitation of the Service Mark from the public view.

Respectfully submitted,

_S/ Dale R. Baringer_
Dale R. Baringer, LSBA #2773
James R. Bullman LSBA #35064
**THE BARINGER LAW FIRM, L.L.C.**
201 St. Charles Street
Baton Rouge, LA 70802-6095
Telephone: (225) 383-9953
Facsimile: (225) 387-3198
*Attorneys for Jay Dardenne, Lieutenant Governor of the State of Louisiana*

Case 3:14-cv-00150-SDD-SCR   Document 2-1   03/14/14   Page 28 of 28